**In the United States District Court**
**For the Eastern District of Michigan**
**Southern Division**

| | | |
|---|---|---|
| **CFI Group USA LLC,** | § | |
| **Plaintiff** | § | **Case Number: 2:19-cv-12602** |
| | § | |
| **v.** | § | **Judge: Gershwin A. Drain** |
| | § | |
| **Verint Americas Inc.,** | § | **Magistrate: Anthony P. Patti** |
| **Defendant** | § | |
| | § | |
| | § | |
| **American Customer Satisfaction** | § | |
| **Index LLC,** | § | **Case Number: 18-13319** |
| **Plaintiff** | § | |
| | § | **Judge: Gershwin A. Drain** |
| **v.** | § | |
| | § | **Magistrate: Anthony P. Patti** |
| **ForeSee Results Inc.,** | § | |
| **Defendant** | § | |

### Motion to Exclude Testimony of Expert Matthew G. Ezell

Plaintiffs American Customer Satisfaction Index LLC ("ACSI LLC") and

CFI Group USA LLC (individually "ACSI LLC" and "CFI LLC," and collectively

"ACSI/CFI") file this Motion to Exclude Testimony of Expert Matthew G. Ezell,

expert witness for defendants ForeSee Results Inc. and Verint Americas Inc.

(individually "ForeSee" and "Verint," and collectively "ForeSee/Verint"), and

show as follows:

1.    On October 24, 2018, ACSI LLC filed its Original Complaint against ForeSee Results Inc. alleging causes of action for unfair competition (15 U.S.C. § 1125) and unfair competition (Michigan common law).

2.    On September 9, 2019, CFI LLC filed its Original Complaint against Verint alleging causes of action for unfair competition (15 U.S.C. § 1125), tortious interference with a business expectancy (Michigan common law), and unfair competition (Michigan common law).

3.    On October 27, 2020, the Court consolidated the two cases for purposes of discovery.

4.    On February 19, 2021, ForeSee/Verint served the expert report of Matthew G. Ezell disclosing the results of his survey purportedly designed "to measure the degree, if any, to which individuals involved in obtaining data about their company's customer satisfaction in the prior two years recognize ACSI."

5.    On March 22, 2021, ACSI/CFI served the expert report of Robert Wallace in which Mr. Wallace raised certain criticisms of Mr. Ezell's report.

6.    On April 5, 2021, ForeSee/Verint served the reply report of Mr. Ezell in response to Mr. Wallace's rebuttal brief.

7.    On May 4, 2021, ACSI/CFI took the deposition of Mr. Ezell.

8.    The deadline for fact and expert discovery has now passed.

9.   Based on the substance of Mr. Ezell's initial and reply reports, as corroborated by his deposition testimony, Mr. Ezell should be excluded from testifying on behalf of ForeSee/Verint for at least the following reasons:

    a.   Mr. Ezell provides no means for quantifying the results of his survey.

    b.   Mr. Ezell's survey is fundamentally flawed because it surveyed the wrong universe of respondents.

    c.   Mr. Ezell's survey is irrelevant to any issue in the pending litigation.

10.   Based on the foregoing, and as described in further detail by the accompanying Brief in Support, ACSI/CFI respectfully ask this Court to:

    a.   Exclude Mr. Ezell from testifying as an expert on any matter.

    b.   Exclude ForeSee/Verint from introducing any evidence based upon Mr. Ezell's opinions.

    c.   Grant ACSI/CFI such other relief as this Court may deem appropriate.

Respectfully submitted,

/s/ Karl J. Edward Fornell
Karl J. Edward Fornell (MI P76327)
Clark Hill PLC
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226
(313) 965-8300
KFornell@ClarkHill.com

William D. Cramer (TX 00790527)
Clark Hill PLC
901 Main Street, Suite 6000
Dallas, Texas 75203
(214) 651-4300
BCramer@ClarkHill.com

Attorneys for Plaintiffs CFI Group USA LLC and
American Customer Satisfaction Index LLC

## **Certificate of Conference**

I certify that on June 2, 2021, I discussed this matter with Attorney Steve Schaetzel, counsel for ForeSee/Verint. We were unable to resolve the subject of the Motion, and therefore ask this Court for assistance in resolving the dispute.

/s / William D. Cramer    June 3, 2021
William D. Cramer              Date

**In the United States District Court**
**For the Eastern District of Michigan**
**Southern Division**

| | | |
|---|---|---|
| CFI Group USA LLC,<br>     Plaintiff | § | Case Number: 2:19-cv-12602 |
| | § | |
| v. | § | Judge: Gershwin A. Drain |
| | § | |
| Verint Americas Inc.,<br>     Defendant | § | Magistrate: Anthony P. Patti |
| | § | |
| American Customer Satisfaction<br>Index LLC,<br>     Plaintiff | § | Case Number: 18-13319 |
| | § | Judge: Gershwin A. Drain |
| v. | § | Magistrate: Anthony P. Patti |
| ForeSee Results Inc.,<br>     Defendant | § | |

**Brief in Support of**
**Motion to Exclude Testimony of Expert Matthew G. Ezell**

Plaintiffs American Customer Satisfaction Index LLC ("ACSI LLC") and CFI Group USA LLC (individually "ACSI LLC" and "CFI LLC," and collectively "ACSI/CFI") file this Brief in Support of Motion to Exclude Testimony of Expert Matthew G. Ezell, expert witness for defendants ForeSee Results Inc. and Verint Americas Inc. (individually "ForeSee" and "Verint," and collectively "ForeSee/Verint"), and show as follows:

## **Statement of Issue**

Whether or not Matthew G. Ezell should be excluded from testifying as an expert on behalf of ForeSee/Verint.

ACSI/CFI answer: Yes

## **Controlling Authorities**

FED. R. EVID. 702

*Daubert v. Merrell Dow Pharms. Inc*., 509 U.S. 579 (1993)

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,* 452 F. Supp. 2d 772 (W.D. Mich. 2006), *aff'd,* 502 F.3d 504 (6th Cir. 2007)

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp*., 174 F.3d 1036 (9th Cir. 1999)

## **Table of Contents**

I.   Procedural History ............................................................... 1

II.  Background Facts ................................................................. 1

III. Argument ............................................................................. 4

      A.   This Court must act as a gatekeeper of proffered expert testimony. ....4

      B.   Mr. Ezell provides no means for evaluating the results of his survey. .5

      C.   The universe of respondents to Mr. Ezell's survey was hopelessly incorrect. ..................................................................................... 9

      D.   Mr. Ezell's survey is irrelevant to any issue in the pending litigation. ...................................................................................... 15

IV.  Request for Relief ............................................................... 16

## I.   Procedural History

On October 24, 2018, ACSI LLC filed its Original Complaint against ForeSee Results Inc. alleging causes of action for unfair competition (15 U.S.C. § 1125) and unfair competition (Michigan common law).[1] On September 9, 2019, CFI LLC filed its Original Complaint against Verint alleging causes of action for unfair competition (15 U.S.C. § 1125), tortious interference with a business expectancy (Michigan common law), and unfair competition (Michigan common law). On October 27, 2020, the Court consolidated the two cases for purposes of discovery.[2] The deadline for fact and expert discovery has now passed.

## II. Background Facts

When the *ACSI LLC v. ForeSee* lawsuit was filed[3], ACSI LLC was a licensee of U.S. TM Reg. No. 2122772 (the "Mark") and had the exclusive right to sublicense the Mark. ForeSee had been a sublicensee of the Mark but voluntarily terminated its

---

[1] The Original Complaint also included causes of action under 15 U.S.C. § 1114 and MCL § 429.42 which have been dismissed.

[2] For purposes of simplicity, except where an argument applies specifically to a single party, this Motion shall refer to the plaintiffs as ACSI/CFI. Because most of the salient facts of this case occurred prior to Verint's acquisition of ForeSee, this Motion shall refer to the defendants as ForeSee except where an argument applies specifically to Verint alone.

[3] The Mark was originally owned by the Regents of the University of Michigan. During the pendency of this lawsuit, UM assigned the Mark to ACSI LLC.

license in 2013. The question in the ACSI LLC v. ForeSee lawsuit is whether or not ForeSee's use of the Mark post-termination was such that it should have continued to pay royalties to ACSI LLC.

When the *CFI LLC v. Verint* lawsuit was filed,[4] CFI LLC was a sublicensee of the Mark. Both CFI LLC and ForeSee (now Verint) provide consulting services to businesses and government agencies to assist them in improving customer satisfaction relating to their websites. These services comprise administering surveys to customers, statistically analyzing the results of those surveys, and providing advice on where improvements will have the greatest impact on customer satisfaction. In 2018, CFI LLC became aware that ForeSee was still using the Mark in its government price schedule, and upon further investigation, discovered that ForeSee's marketing and sales strategies included communications that leveraged ForeSee's former association with the Mark.[5] Because only CFI LLC was licensed to use the Mark, and because only CFI LLC continued to use the statistical analysis techniques associated with the Mark, CFI LLC filed suit against Verint in 2019. The

---

[4] Verint acquired ForeSee after the *ACSI LLC v. ForeSee* case was filed.

[5] Some of ForeSee's communications expressly included the Mark, while other communications included terms and phrases that ForeSee had previously used in the context of the Mark. By way of background, but not necessary for the Court's consideration of this Motion, in 2010 or 2011, ForeSee abandoned the tried-and-true statistical analysis techniques associated with the Mark, but continued to market its services as though it still used these analysis techniques.

question in the *CFI LLC v. Verint* lawsuit is whether or not ForeSee unfairly competed with CFI LLC by creating a false impression that ForeSee's services were affiliated with, connected to, associated with the Mark, or sponsored or approved by the owner of the Mark.

On February 19, 2021, ForeSee/Verint served the expert report of Matthew G. Ezell disclosing the results of his survey purportedly designed "to measure the degree, if any, to which individuals involved in obtaining data about their company's customer satisfaction in the prior two years recognize ACSI." On March 22, 2021, ACSI/CFI served the expert report of Robert Wallace, in which Mr. Wallace raised certain criticisms of Mr. Ezell's report. On April 5, 2021, ForeSee/Verint served the reply report of Mr. Ezell in response to Mr. Wallace's rebuttal brief. On May 4, 2021, ACSI/CFI took the deposition of Mr. Ezell.

Based on the substance of Mr. Ezell's reports, and confirmed by his deposition testimony, it is clear that Mr. Ezell should be excluded from testifying on behalf of ForeSee/Verint for at least the following reasons:

1.  Mr. Ezell provides no means for quantifying the results of his survey.

2.  Mr. Ezell's survey is fundamentally flawed because it surveyed the wrong universe of respondents.

3.  Mr. Ezell's survey is irrelevant to any issue in the pending litigation.

## III.    Argument

### A. This Court must act as a gatekeeper of proffered expert testimony.

Under the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. The Supreme Court has given this Court the job of acting as "gatekeeper" to ensure that expert testimony satisfies the requirements of FED. R. EVID. 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Courts have recognized a number of non-exclusive measures of reliability, but for purposes of this Motion, the most relevant measures are:

- The existence of standards controlling the opinion. *E.g., Daubert v. Merrell Dow Pharms. Inc*., 509 U.S. 579, 593 (1993).

- Whether or not the expert's opinion is based on sufficient facts or data. *E.g., United States v. Ramer,* 883 F.3d 659, 680 (6th Cir. 2018).

- Whether or not the expert's opinion relates to an issue in the case. *E.g., Daubert,* 509 U.S. at 591.

If the Court determines that the expert's opinion will not assist the trier of fact, it should exclude that opinion from evidence. *See* FED. R. EVID. 702.

### B. Mr. Ezell provides no means for evaluating the results of his survey.

In *Daubert*, the Supreme Court noted that a court should consider "the existence and maintenance of standards controlling the technique's operation." 509 U.S. at 594. In *United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir. 1978), which the *Daubert* court cited to support this requirement, the 2nd Circuit considered whether or not the number of scientists who favored the use of spectrographic analysis (versus the number of scientists who did not favor the use of spectrographic analysis) was an indicator of reliability. *Id*. The court noted that "determination of reliability cannot rest solely on a process of "counting (scientific) noses," and went on to list several proper indicia of reliability, including the "the existence and maintenance of standards." *Id*. In the case of spectrographic analysis, the court noted that an association concerned with the training and certification of spectrographic examiners required ten matches be found before a positive identification could be made. *Id*.

Here, Mr. Ezell has merely "counted noses" without providing any context for analyzing the results. More particularly, according to his report, Mr. Ezell was hired "to design a survey to measure the degree, if any, to which individuals involved in obtaining data about their company's customer satisfaction in the prior two years

recognize ACSI." Rep. Ezell p. 1[6]. He went on to render his opinion: "It is my opinion that the results of the survey support a finding that the term ACSI is not well recognized in the field of customer satisfaction." *Id*. He then provides the following metric:

> Approximately 23.5% of the relevant universe recognized the term ACSI. This level of recognition falls well short of the approximately ***50% association generally required to show secondary meaning or acquired distinctiveness***.

*Id*. p. 2 (emphasis added). But the metric Mr. Ezell provides here is neither relevant nor accurate. First, Mr. Ezell testified that he did <u>not</u> conduct a secondary meaning survey:

> Q.    Okay. What kind of survey did you design in this case?
>
> A.    In this case, I was engaged to design and conduct a survey to measure the recognition, if any, of the term "ACSI" among individual – generally speaking, in the field of customer satisfaction, specifically among individuals who were involved in obtaining customer satisfaction data for their company.
>
> Q.    Okay. And you did not conduct a secondary meaning survey, correct?
>
> A.    Not in this matter, no.
>
> Q.    Okay. So the type of survey that you conducted in this matter, does it have a particular name that people in the field of survey design use to describe it?
>
> A.    I've characterized my survey as a recognition survey. Sometimes you'll see related terms such as maybe brand awarenesses-related or the

---

[6] Mr. Ezell's report is attached as Exhibit 1.

terms unaided recall or aided recognition are related to this concept of recognition generally.

Q.    Okay. How does your survey differ from a secondary meaning survey?

A.    How is it different. I would say the most – well, one difference is the question – or the questions that I asked had to do with unaided recall of names of companies that measure customer satisfaction or customer satisfaction measures. Those are not typical secondary meaning questions. Also, I asked an aided recognition question. Again, just fundamentally, that's not the same as a secondary meaning question, although the concepts are somewhat related, I would say.

Dep. Ezell 38:10-39:19 (objections omitted).[7] Further, Mr. Ezell was unable to provide any source for evaluating the results of an awareness survey using the metrics that are used for evaluating a secondary meaning survey:

Q.    I'm just still trying to get an answer as to how you can form an opinion related to secondary meaning based upon the results of a survey that's designed to measure awareness.

A.    Again, I don't think I've opined as to secondary meaning. I've opined as to my recognition survey. And I have characterized the results with respect to secondary meaning surveys and their results, because I believe the concepts are related.

Q.    Okay. Are you aware of any authoritative text that says that you can conduct an awareness survey and then characterize the results with respect to secondary meaning?

A.    I think there's general discussion in the literature that these are related concepts. I'm not aware of a specific section in a piece of literature that does exactly what you say.

---

[7] Excerpts of Mr. Ezell's deposition transcript are attached as Exhibit 2.

*Id*. 59:25-60:18 (objections omitted).

Second, Mr. Ezell didn't accurately quote the McCarthy reference, which notes that "[g]enerally, figures over 50% are regarded as ***clearly sufficient***." Rep. Ezell n. 3 (emphasis added). From this quote, Mr. Ezell manufactured a different requirement: "This level of recognition falls well short of the approximately 50% association ***generally required*** to show secondary meaning or acquired distinctiveness." Rep. Ezell p. 2 (emphasis added). When challenged on this, Mr. Ezell admitted that McCarthy's 50% metric was not a hard and fast rule:

> Q.     Okay. Did you read that section of McCarthy on Trademarks?
>
> A.     I have read that section in the past. I have not read it yesterday, for example.
>
> Q.     Do you recall if there were any references in that section of McCarthy on Trademarks that talked about instances where figures less than 50 percent have been regarded as sufficient?
>
> A.     Yes, I'm generally aware that Professor McCarthy discusses and I'm generally aware that case opinions involving survey evidence also discuss that sometimes a court will rely on evidence of less than 50 percent to show secondary meaning. Sometimes 40 percent or more may be sufficient, but you need to have other evidence or other factors weighing in, as well.

Dep. Ezell 62:5-20.

As such, not only did Mr. Ezell wholly fail to provide any quantitative metric from evaluating a level of awareness, but for the inapplicable metric he did provided, he manufactured a metric not supported by the only reference he listed. Therefore, because the conclusions drawn by Mr. Ezell from his survey are unreliable and will

not assist the trier of fact to understand the evidence or to determine a fact in issue, he should be excluded from testifying.

### C. <u>The universe of respondents to Mr. Ezell's survey was hopelessly incorrect.</u>

Rule 702 requires that expert testimony be "based on sufficient facts or data." In the context of a trademark survey, the "facts or data" are the underlying survey results, and there are clear standards in considering the admissibility of such survey results including a requirement that the "universe" of potential respondents was properly defined and that a representative sample of that universe was selected. *E.g., Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,* 452 F. Supp. 2d 772, 778 (W.D. Mich. 2006), *aff'd,* 502 F.3d 504 (6th Cir. 2007). And if the flaws in the survey are too great, the court may exclude the survey because its probative value is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial. *Id.*

McCarthy describes the importance of selecting the proper universe of respondents:

> The first step in designing a survey is to determine the "universe" to be studied. The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in this case. Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.

6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:159 (5th ed.) (footnotes omitted). McCarthy goes on to note where the failure to select the proper universe is grounds to exclude the survey altogether:

> If the survey universe is sufficiently close to the "correct" universe, it can be regarded as a technical defect, allowed into evidence but given less weight than it would be otherwise entitled. But if the universe selected is significantly skewed away from the proper group of people whose perception is at issue, it may be excluded from evidence altogether.

*Id.* (footnotes omitted). As set forth *infra*, exclusion of Mr. Ezell's testimony regarding his survey is warranted.

First, the description of goods and services of the Mark is "business and market research and analysis services, namely, the reserach [sic] and periodic measurement, publication and distribution to others of customer evaluation of the quality of goods and services purchased in the United States in major industry sectors." It is readily apparent that use of the Mark is in the context of customer evaluation services provided <u>to others</u>, and not merely the services a business might provide internally.

Second, Mr. Ezell was aware that both ForeSee and CFI LLC were in the business of providing customer evaluation services provided to others:

> Q.     Okay. How about ForeSee? What's your understanding of the business that ForeSee does?

A.    I understand that they are – a company that measures customer satisfaction.

Q.    Okay. And you can engage ForeSee to measure your company's customer satisfaction; is that right?

A.    That's my general understanding.

Q.    Okay. And do you have an understanding about whether you can engage CFI to measure your company's customer satisfaction?

A.    My understanding from the pleadings or the facts of this case was that depends on the time frame. I believe at some point the answer was "No," and at some point the answer was "Yes."

Dep. Ezell 152:15-153:6 (objection omitted).

Third, even if Mr. Ezell was unclear about the business of CFI LLC and ForeSee, Verint describes ForeSee's business as follows:

11. ForeSee completes over a million customer satisfaction surveys annually, with nearly 1.4 million surveys in 2019, covering over 800 "benchmark" categories that allow companies to compare their performance in customer experience against themselves over time, against direct competitors, against companies within the same industry, and against top customer experience companies, regardless of industry. (*See, e.g.*, Ex. D at 3 (ForeSee Retail Benchmark Report 2016)).

12. More particularly, ForeSee provides customer satisfaction "scores," which represent key indicators of satisfaction and measures of customers' future behaviors. (Ex. E at 3 (The ForeSee Methodology)). These scores can be used to compare individual corporate performance over time, performance against direct competitors, performance against companies within the same industry, and performance against top customer experience companies, regardless of industry.

Defendant's Amended Answer and Counterclaims to Plaintiff's Complaint (Case 2:19-cv-12602, ECF No. 20, PageID.422).

Therefore, it should have been blindingly obvious that the proper universe of survey respondents would be persons who, on behalf of their employers, retain companies like CFI LLC and ForeSee to provide services permitting their employers to compare their performance in customer experience against themselves, against direct competitors, against companies within the same industry, and against top customer experience companies. Further, because of the cost of providing such services,[8] small businesses would be unlikely to be customers of CFI LLC or ForeSee.

Yet, Mr. Ezell purposefully used a screener question intended to set a quota of respondents that included people working for small companies:

S4   Approximately how many people does your company employ nationwide?
   1. 1 to 9
   2. 10 to 99
   3. 100 to 499
   4. 500 or more
   5. Don't know  **Terminate**

**Set quotas as follows:**
|  |  |
|---|---|
| **1 to 9** | **10%** |
| **10 to 99** | **23%** |
| **100 to 499** | **14%** |
| **500 or more** | **53%** |

---

[8] For example, ForeSee's old GSA price schedule lists an "entry-level" platform at $20,000. *See* Exhibit 3 p. 3.

Rep. Ezell App. A[9], p. 1. Further, he purposefully used a screener to include anyone, who in any capacity, was involved in "[o]btaining data about your company's customer satisfaction."

S5    In the past 24 months, which of the following activities, if any, have you been involved in?  (Select all that apply.)  **Randomize list.  Anchor "None of the above" at bottom and make exclusive.**
     1.  Obtaining data about your company's customer satisfaction
     2.  Interviewing or hiring full- or part-time personnel for your company
     3.  Writing code in C++
     4.  Using computer-aided design (CAD) software
     5.  None of the above
**If 1, continue.  Otherwise, terminate.  If 1-4 all selected, terminate.**

*Id.* at p. 2. Because of these two failures in defining the proper universe of respondents, Mr. Ezell's survey results may have included, for example:

Employees of a retail store who assist in distributing, collecting, or reminding customers to take the store's own self-created customer satisfaction survey.

- Customer service employees of a utility who receive or review customer comments and complaints.

- A restaurant owner who once used a free on-line survey to get client ratings to post on his restaurant's website.

- The owner of a delivery company who occasionally calls some of his customers for informal feedback.

_____

[9] Excerpts of Report Appendix A are attached as Exhibit 4.

- A dentist who solicits Yelp reviews and Facebook likes from her patients.

Under Mr. Ezell's screening criteria, each of these persons have been involved in "obtaining data about their company's customer satisfaction." None, however, are likely to be purchasers or potential purchasers of the services of either ForeSee or CFI LLC. It is impossible to determine how many of the respondents included in Mr. Ezell's survey were inappropriately included. However, the results of Mr. Ezell surely should have raised a red flag. In response to two questions soliciting the names of companies that "measure customer satisfaction," none of the survey respondents named ForeSee, CFI LLC, or ACSI LLC. Rep. Ezell p. 6. And in response to two questions soliciting "customer satisfaction measures," none of the survey respondents answered ACSI or FXI (the name of ForeSee's Experience Index measurement). *Id*. at p. 7. Consequently, a fair conclusion is that very few of the survey respondents were drawn from the proper universe.

Because Mr. Ezell selected his survey respondents from the wrong universe, and because it is impossible to filter out answers from improperly selected respondents, any conclusions drawn by Mr. Ezell from his survey are unreliable. As such, his testimony will not assist the trier of fact to understand the evidence or to determine a fact in issue and he should be excluded from testifying.

### D. **Mr. Ezell's survey is irrelevant to any issue in the pending litigation.**

As the Supreme Court stated in *Daubert*, Rule 702's requirement that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue … goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Daubert*, 509 U.S. at 591 (quoting from 3 WEINSTEIN & BERGER ¶ 702[02], pp. 702–18).

Mr. Ezell described the purpose of his survey as follows:

Q.      What was the point of your survey?

A.      To collect – To collect data.

Q.      Okay. To collect data for what purpose?

A.      My survey specifically was to measure whether or not consumers of – sorry, people responsible for obtaining customer satisfaction data for their company, whether or not they recognized ACSI as a company or as a measure.

Dep. Ezell 195:9-20 (objections omitted). Mr. Ezell hinted that a secondary meaning survey could be related to determine "whether a mark is well known or strong." *Id*. 50:5-8. But ignoring the fact that Mr. Ezell admitted that he did not conduct a secondary meaning survey, and even assuming Mr. Ezell's statement relating secondary meaning surveys to measuring mark strength, here the strength of the Mark is not at issue. For example, as McCarthy has noted, "Whether a mark is weak or not is of little importance where the conflicting mark is almost identical and the goods are competitive or very closely related." 2 MCCARTHY ON TRADEMARKS AND

UNFAIR COMPETITION § 11:76 (5th ed.); *see also Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1058–59 (9th Cir. 1999) ("Because the products involved are closely related and West Coast's domain name is nearly identical to Brookfield's trademark, the strength of the mark is of diminished importance in the likelihood of confusion analysis."); *Sands, Taylor & Wood Co. v. Quaker Oats Co*., 978 F.2d 947, 959 (7th Cir. 1992) (citing McCarthy and then discounting purported weakness of the mark because "[h]ere, both the marks and the goods – Quaker's Gatorade and the isotonic beverage that STW would market but for Quaker's actions – are virtually identical.").

ForeSee does not use an "almost identical" mark but rather uses the <u>identical</u> mark. And ForeSee does not use the mark in conjunction with a "very closely related" services but rather the <u>identical</u> services. Accordingly, to the extent that the results of an awareness survey might be relevant to the question of a mark's strength, those results have little or no probative value, and as such, Mr. Ezell's testimony will not assist the trier of fact and he should be excluded from testifying.

## IV.    Request for Relief

ACSI/CFI therefore respectfully ask this Court to exclude Mr. Ezell from testifying as an expert on the topic of awareness, to exclude ForeSee/Verint from introducing any evidence based upon Mr. Ezell opinions, and to grant ACSI/CFI such other relief as this Court may deem appropriate.

Respectfully submitted,

/s/ Karl J. Edward Fornell
Karl J. Edward Fornell (MI P76327)
Clark Hill PLC
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226
(313) 965-8300
KFornell@ClarkHill.com

William D. Cramer (TX 00790527)
Clark Hill PLC
901 Main Street, Suite 6000
Dallas, Texas 75203
(214) 651-4300
BCramer@ClarkHill.com

Attorneys for Plaintiffs CFI Group USA LLC and
American Customer Satisfaction Index LLC